Good morning. May it please the court. My name is Rebecca Smith and I represent the Appellant Alliance for the Wild Rockies. I would like to start out today by addressing what is the primary issue in this case, which is the agency's failure to re-initiate and complete Endangered Species Act Section 7 consultation on the Northern Rockies links management direction after the designation of links critical habitat on national forest lands. As the court is aware in the opinion in Cottonwood, this court addressed the same legal claim and held that the agencies did in fact need to re-initiate consultation on the Northern Rockies links management direction or the links amendment to address this same issue. And so in Cottonwood, the difference was there was no site-specific project challenged in Cottonwood. And so there was an issue with injunctive relief. The legal claim was established, but what this court held in Cottonwood regarding injunctive relief was that the Thomas V. Peterson line of cases that held that irreparable harm was presumed was no longer a good case law post-winter and that although the court, essentially what the court did was it vacated the district court's denial of injunctive relief in Cottonwood and then remanded so that the plaintiffs could have an opportunity to establish whether there was a specific project that was causing irreparable injury. And so post-Cottonwood, the takeaway is that the plaintiff is entitled to summary judgment on the consultation claim and then in order to determine whether injunctive relief is warranted, the plaintiff must establish that there is a specific project that can cause irreparable injury. Let me ask you this question. Why does Section 7D of the ESA apply here where consultation on the East Reservoir Project is complete? Because the agency action that's at issue in Section 7D is the links amendment itself. It's one step removed, though. Yes. 7D seems to apply to a specific instance. No, Your Honor. In Pacific Rivers Council and Lane County Audubon, as well as as far back as Connery-Burford, this Court has repeatedly said that when the federal agencies reinitiate ESA consultation on a large plan that's going to plan, say, for the viability of an endangered species, ESA Section 7D applies to prevent site-specific projects from being implemented. Let me ask you this. Does the government agree with you on that, but they say that you waived it? Is that what? Let's say if the government weren't making the argument that you waived this, would they agree with your interpretation that 7D applies here? Your Honor, I'm not sure what the government is going to say. And the reason is that in our opening brief, we raised ESA Section 7D as an alternate grounds for injunctive relief. So just to step back, under Cottonwood, this Court said if there is a project that causes a reparable injury, such as a timber sale project, then that project can be enjoined. The Court did not disturb the Endangered Species Act standard that says the public interest always weighs in favor of the endangered species and that the balance of harm is in favor of granting an injunction. So all the Court did in Cottonwood was say, but you do have to show there is a specific project causing a reparable injury. So Cottonwood is the controlling case. It's the same legal claim. The district court erred. Did you really raise a links amendments type claim? Absolutely, Your Honor. And was it litigated in the district court? Yes, Your Honor. If you look at the district court opinion at ER 28 as well as ER 33, first the district court says plaintiff, well, the district court recognized that there was three distinct links claims. And the district court said, first, plaintiff contends that the Forest Service must reinitiate consultation with the Fish and Wildlife Service regarding links critical habitat before proceeding with any logging-related project within that habitat, et cetera. Then he said, second, plaintiff argues that the conclusion that the project is not likely to adversely affect is arbitrary and capricious. So the district court acknowledged that there is two distinct claims, one on reinitiation of consultation for the project analysis. That was at ER 28. Then the district court went on at ER 33, and in its conclusion it said, Cottonwood does not present a per se rule prohibiting timber projects from proceeding pending the Forest Service and Fish and Wildlife Service reinitiating consultation on the links amendment. Consequently, the court will deny plaintiff's motion for summary judgment on this point. That's at ER 33. So the district court did explicitly address this claim. The issue was it conflated the legal claim for reinitiation of consultation with the relief requested, the remedy. And so because the district court did not want to grant us the relief that we requested, the injunction, it ruled against us on the legal claim of reinitiation of consultation. But as a matter of stare decisis under Cottonwood, which was decided after this lawsuit was filed, as a matter of stare decisis, plaintiff was entitled to summary judgment on that legal claim that there must be a reinitiation of consultation. Then the second step is to then determine whether injunctive relief is warranted as a remedy. And for that, the court has to look no further than the plain language of Cottonwood itself, which in that case also remanded for a determination as to whether there should be. Let me say one approach that the district court took or the approach the district court took was to say, well, there's an independent reason here why you're not entitled to injunctive relief or why they complied. That was they looked at the constituent elements for the links when the Forest Service originally designated the forest land or expanded the habitat for the links by looking, by adding on forest land. And they identified the essential elements that needed to be considered when any further action is taken. And didn't the agency here really sort of match up what they were doing with those core constituent elements? No, Your Honor. Why not? Well, the district court was talking about this project analysis. And what the district court says is as long as there's a project analysis on links critical habitat, it doesn't matter that there is no adequate biological opinion yet for the Northern Rockies links management direction itself. And so aside from being contrary to Pacific Rivers Council, Cottonwood, Lane County and Cotterview-Burford, that's also not true because at ER 551 that is the Forest Service's conclusion for this project. And it says the proposed action is not likely to adversely affect designated critical links habitat. This determination is based on the fact that one, the actions of the East Reservoir Draft EIS comply with all standards, guidelines and objectives of the Northern Rockies links management direction record of decision and the activities fall within the scope of those analyzed in the subsequent biological opinion. So if we found that the consultation, I'm doing a hypothetical here, if we found that the consultation on the East Reservation project provides an independent basis for concluding that the project is unlikely to adversely affect links critical habitat, are we then compelled to allow the project to proceed? No, Your Honor, because there's two... Do you have any other word than no? Can I get you to say yes at some time in there? Because there's two separate claims and the question you just raised would be, is the project consultation arbitrary and capricious? But we first have to look at the first claim, which was the re-initiation of consultation on the links amendment. So this court must reverse the district court because that claim is controlled by Cottonwood. But didn't they also... Okay, but then besides that, the Forest Service consulted on a revised Kootenai forest plan of 2013, which considered impacts to currently designated links critical habitat and reaffirmed the efficacy of the links amendment. Why does this not provide a sufficient unit-wide analysis to allow the East Reservoir project to go forward? Because the links amendment itself still doesn't have a biological opinion. The Kootenai forest plan incorporated the links amendment, but it's the links amendment itself that has to have the biological opinion under this court's decision in Cottonwood. And I would like to get back to part of what your question was earlier, Your Honor. It was about whether you can just do a project-level consultation. I want to emphasize that in this court's opinion in Pacific Rivers Council, this is a very similar case where there was a re-initiation of consultation on a forest plan, and the Forest Service made this very same argument and said, well, we've done all of these project consultations, and the project consultations mean that you don't have to issue any injunctions. And this court rejected that argument at 30 Fed 3rd, 1056 to 1057, and said Section 7A2 mandates that the Forest Service enter into consultation on the forest plan. Its conclusion that these activities, i.e., the projects, may affect the protected salmon is sufficient reason to enjoin these projects. Only after the Forest Service complies with Section 7A2 can any activity that may affect the protected salmon go forward. What's that case again? That's Pacific Rivers Council, Your Honor. Thank you. And, Your Honor, I would like to say that this court recently did issue a memorandum disposition in another case, Alliance for the Wild Rockies v. Christensen, which was cited in our briefing. And since that decision, the district court, a different judge within the District of Montana, has accepted the argument that plaintiffs are making, and that was in the Alliance for the Wild Rockies v. Martin case, 2016 Westlaw 6901264. And I just want to quote the rationale there. The court said, the project consultation requires incorporation of a programmatic analysis. Incorporation of a programmatic links amendment consultation will be lawful, however, only after the reinitiated consultation on the links amendment has been completed. The reason for listing links as threatened under the ESA supports the court determination, because the Fish and Wildlife Service found that federal land management plans did not adequately address risks to links, and that the plans allowed actions that cumulatively could result in significant detrimental effects. Okay, so that unpublished case says what you want, but there isn't a published case that says exactly what you want. That's correct, Your Honor. And so you're asking us to say that. Yes, Your Honor, because this is how the district court is now interpreting the issue after Cottonwood and after this Court's memorandum disposition in Christensen, which, as the district court stated in its opinion in this case, it was specifically waiting for this Court's opinion in Christensen. At ER 33, the district court said, quote, the undersigned will await a more direct answer before abandoning its approach, and it was waiting for the answer from this Court in Christensen. In Christensen, this Court enjoined two timber sale projects because they posed irreparable injury to the plaintiff's interests. And if I could reserve the rest of my time for rebuttal. Yes. Thank you. May it please the Court, Tamara Rountree for the United States. I'd like to begin with the point that there are two post-Cottonwood cases that reveal this Court's approach to project-specific consultations that are conducted with respect to Lynx Critical Habitat. Those cases are Garcia and Christensen. But in both of those cases, there was a project-specific consultation that was done analyzing impacts to Lynx Critical Habitat. And in both opinions, the Court expressly relied on look to Cottonwood for guidance in the discussion of the consultations that had been done on these specific projects. In neither case did the Court automatically enjoin the projects, and in neither case did the Court reject the consultations out of hand. Instead, what the courts did is they examined the agency's analyses and made their decision based upon that examination of the specific consultations that the agency had conducted. Now in Christensen, the Court had found that the agency had impermissibly relied on the Lynx amendments consultation. And it affirmed the injunction on those two projects. As a sidebar, there's a relationship between Christensen and Cottonwood. They were both the same individual projects. And the Court in Cottonwood, as part of a standing discussion, it made the comment that the agency had relied on the Lynx amendments. And in essence, Christensen just picked up on that language. But so in Christensen, the Court enjoined, having found that the agency relied, as I said, impermissibly on the Lynx amendment consultation. But in Garcia, the Court found that the agency had only relied in part on the Lynx amendment consultation and remanded to the district court, and I believe you read the language, Judge Callahan, similar language, remanded to the district court for that court to make a determination of whether the agency conducted a sufficient and independent analysis of critical habitat that would have rendered its reliance on the Lynx amendments harmless. So what do we have here? So if we look at that as obviously counsel for appellant is saying that until the reconsultation is done, nothing can happen. That is if this case had been a challenge to, a direct challenge to the agency action of adopting the Lynx amendments, and it's not. The point I just want to make. Well, but I'm sort of hearing the appellant to take a little more, that they say everything has to stop until the Lynx amendment reconsultation is done. The only way they can say that is if, well, let me. Well, they can say it. Okay, I'm just stating the position. No, I'm saying the basis for. First, the way in which that type of argument that's based on the Lynx amendment can come before you is if there is actually a challenge to the Lynx amendment itself. And I would say to the Court that clearly there's nothing in the record that supports that this case is a direct challenge to two agency actions, one being the adoption of the Lynx amendments and the other being this project. It is only a challenge to this project. And the basis for my saying this is, for example, if you look at the first page of the District Court's order. Now, this is the fact finder in this case. The first sentence of the District Court's summary judgment order says, before the Court, our cross motions for summary judgment in this environmental case centered on the East Reservoir Forest Restoration Project. That sentence and the remainder of the order represents that the District Court's understanding was that this case challenged only the East Reservoir Project. And tellingly, Alliance hasn't argued to this Court that the District Court got it all wrong in its characterization of our lawsuit. It misconstrued the scope of our lawsuit. The scope of the lawsuit is the East Reservoir Project. The way in which the Lynx amendment is folded in is only with respect to the release sought. They are challenging the East Reservoir Project. They are saying or alleging that the East Reservoir Project should not go through, should not proceed until consultation is done on the Lynx amendment, which is something over there. It's only with respect to their relief. There is no direct challenge to the Lynx amendment here. Where that can lead me now is to your question about, or I believe it was your question about Section 7. If you look at the language in the opening brief, it's correct that they raise Section 7 only with respect to the issue of injunctive relief. As we argued in our brief, at the time the opening brief was filed, the only determination that had been made on this case was made by the District Court. And the District Court found there had been no violation of the ESA. Therefore, the question of injunctive relief was premature. There's no reason for us to argue what this Court should do in terms of injunction relief until this Court rules on the merits. So our argument in our response brief was Section 7 doesn't apply, injunctive relief doesn't apply, put that aside, which is why we didn't address it in our response brief. We didn't address Section 7. But if you look at the language in Alliance's reply brief, they have specific language that indicates that they understand the scope of Section 7, and they understand that there's a particular trigger in Section 7. They say in their reply brief, for example, now that the Forest Service has reinitiated consultation on the Links Amendment, and they're discussing their motion that was filed for the Court to take judicial notice of the reinitiated consultation on the Links Amendment, they're speaking to that saying now that that has happened, Section 7 controls. They also say once the Forest Service initiated consultation on the Links Amendment on November 2nd of last year, 2016, Section 7 was triggered. They understand that there is a trigger in Section 7. It is triggered when there's initiated consultation. As for this particular project, the East Reservoir Project, even before the lawsuit was filed, the consultation had been initiated, it had been completed. Section 7 had no role in that case or in the review of this case. Section 7 arguably applies to this new development, this new issue, which is reinitiation on the Links Amendment, which I'd rather not address because, as we said, this is not before this Court. This Court is not looking at the question of reinitiation. Who's going to talk about the roads? Who's going to talk about it? The roads. Did you say who would you like me to? Well, there's two of you talking. Oh, I'm sorry. No, we haven't. It's not subject matter split. You can discuss the roads with whomever. Well, I guess then my question would be, can you point to any evidence in the record that the Forest Service compared linear miles of road under the East Reservoir Project to the 2009 baseline conditions? Your Honor, I'm going to answer your question. Please don't be annoyed that I'm going to preface it. The threshold question for this one. That would tell me that your answer would be no, but you're going to tell me why no. What I will do to make sure I get this satisfied and out of the way, I'm going to refer the Court to excerpts of record at page 538, which is the biological opinion, and it states the East Reservoir Project does not propose any permanent increase in either linear open or total road miles above the baseline condition with a net reduction of 0.3 linear miles of road. Therefore, it is consistent with the 2001 Access Amendment and the subsequent biological opinion. The statement is that, and the agency's position is that, it did not exceed the the... What was the baseline? What is the baseline number for the Boers area? I will... Where did you get it from? I couldn't tell. Your own plan says that the Forest Service was required to determine whether the project added roads to the baseline. Right. So if we don't know what the baseline is, how can you show that you did that? I'm sorry. That figure is in our brief. The baseline, I don't know the total roads. I'm blanking on the... There was a lot of numbers. Let me start where I was going. It did not zero down into the original baseline. I will look for the total miles of roads in the baseline, but let me begin with the point that there are documents that could be in the administrative record. Our argument here has been hamstrung by the fact that we didn't include specific documents in the administrative record, and the reason was because Alliance did not raise this highly specialized issue. Clearly, the Court understands this is not a simple sentence about there going to be an increase in roads. This is about undetermined roads, definitions, the access amendment, the baseline. In this administrative record, you will not find the access amendment itself. You will not find, for example, the GIS overlay that the agency has that it puts over all new projects that shows all of the roads in the baseline, all of their definitions. And the reason is because... Maybe you should just go back to the district court and do it again. The point I'm making is that it's not in this administrative record. These are all tools and information that the agency has. It is not in this record because it was not raised before the agency. This issue that is now before this Court, this issue that the agency has been called upon to suddenly defend, was not raised before the agency. Therefore, it was not, it should not be before this Court. There was no administrative exhaustion, and that's why the record doesn't have all of the documents that I need as an attorney, the agency needs as an agency, to show this Court that it did. Well, but I thought that the way Alliance argued at the agency that the project adds to the baseline number of roads within the tobacco bores reason by adding 2.6 miles of undetermined roads to the National Forest Road systems. And the federal defendants argue that it does not do so because the undetermined roads already existed. So, there was discussion about it? Well, because you're saying it's unexhausted. No, I'm sorry. I'm so sorry. Where did you just read from? I am looking at, well, your argument, I saw it in the red brief at 48, and they raise it. I don't have a cite. No, I'm sorry. If you could repeat your question. Well, I thought that you were saying that they never raised this before. No, before the agency. And that it's not exhausted. Right. Before the agency. There is nothing in their specific written comments, which is the first stage of commenting, and there's nothing in their objection to the agency that raised this issue. There was one document, and then there was a later document, and in between is when they raised it before the agency. No, no. There are two comments periods, if you will, where they can express their concerns, and they are required to by the agency's regulations. This is a season-leading party, and they understand what's required. There are exhaustion requirements. When did the agency first address the issue? Well, this issue that we're discussing, in litigation, once. No, no. In the administrative process. Didn't the agency raise it a little bit late in the administration? No, no, no. The agency didn't raise anything late. The whole point is that Alliance didn't bring it to the agency's attention, so this wasn't fleshed out in the administrative record. I can't point to you anything where these questions were asked before the agency, and, therefore, the agency didn't respond in the administrative process. Thus, none of what should the bulk of all of this discussion that we're having now didn't find its way into the administrative record because the agency wasn't told of this, wasn't apprised of this, when this was before them. Okay. Can I get a clarification? You cited ER 538. Yes. And it talks about road use and timber hauling. Okay. So that document discussed roads. And what you're saying is the Alliance never objected to what was said in this document, therefore, the baseline issue was not raised. Well, what maybe will help, Judge Paez, at page 43 is where is the discussion of total roads in the Boers' history. In your response. In my brief, yes. In your answering brief. Yes. And as to your question, what I'm going to do, Your Honor, is turn your attention to the only sentence that was raised before the agency about the issue of roads. And I would like to quote it to be fair and to make sure that I get it correct. It is page the intervener's supplemental excerpts of record at page 132. It states, the East Reservoir Project poses a threat to grizzly bears because it plans to increase the total linear miles of road in the Boers, period. The agency could not possibly understand that it needed to talk about what's in the access amendment or that it has an overlay to tell them what's in the access or tell them what's in the baseline or how it defines undetermined roads, how it defines unauthorized roads or illegal roads or how all of this is accounted when it makes actual calculations. None of this is encompassed in that single sentence. So what I have is a biological assessment that says that the agency looked at the baseline and it, as a practical matter, the agency, when it has a project, it goes out to the project area and does a specific assessment of all the roads. If the agency ignored the baseline in the access amendment, it wouldn't know whether every single road was new or every single road had been there. It could not possibly function by not knowing what's in the baseline. It takes its overlay. It then looks at the roads that are there, places the overlay, the overlay being the access amendment baseline, roads, distances, categories, puts it over the new project and says, this road was there. This road was an undetermined road when the access amendment baseline was created. This one was not. That's how it makes its determination, and that's what was done here. Then it made its calculations. And the whole discrepancy here is because Alliance wants to assume that the category of undetermined roads somehow is categorically excluded or included when the agency makes its calculations. And for this Court's edification, if we will, or for its knowledge, the grizzly bears do not care what the category of the road is. The grizzly bears do not create, don't care who created the roads. And actually, grizzlies don't necessarily care that there's asphalt on the ground. What they care about is motorized traffic on those roads. And when the agency makes its assessment, it makes its assessment not only on total linear miles of roads, for example, but it will add or subtract roads based on what's motorized. It will close roads. It will barrier them. If they're closed, if they're barriered, they cannot, and there's no way that a car can pass through it or a motorized vehicle. That, for purposes of the bears and for purposes of the access amendment and the Boers area, is satisfied. So I just want the Court to understand that, to the extent we're really hung up on terms and categories here, it's not necessarily important to the bear in terms of the terms or categories of the roads. Okay. Thank you. May I close? You've already taken all of your co-counsel's time. Oh, I'm eating his time. Yes. If you ask me questions, I'm sure that our presiding judge will give you time. I will allow him to have a few minutes. But asking for more time is probably pushing it. What do you say? Yes. Thank you, Your Honors. I appreciate the Court's indulgence. representing Lincoln County, Montana, and the Kootenai Forest Stakeholders Coalition. This project is a good project, and it should be approved. And there are three main reasons that this project should be approved. One is the collaborative history and the unique collaborative context. Two is the district court properly interpreted and applied Cottonwood. And three, the NLAA determinations were rational and supported by the record. Following up on the last discussion, I do want to address roads very quickly. And that is, if you look at ER 392, that's a discussion in the final environmental impact statement that talks about what the baseline is, that this will reduce roads from the baseline in the tobacco bears outside recovery zone. I also refer the Court to page 125 of our executive record, and that is an excerpt from the Links Amendments themselves. It refers to roads on national forest lands, not national forest system roads. That indicates these type of roads, which were already on the landscape but not classified as national forest system roads, were part of the existing condition, part of the baseline. As far as waiving that argument regarding roads, the Alliance's comments there at ISER 82, there's no indication on that page of anything about compliance with the Access Amendments. Under Havasupai Tribe, they had to raise that issue at the comment stage. Raising it at their administrative objection was too late. Now, the District Court complied with Cottonwood in a way that this Court has implicitly approved in the Christensen case as well as the Gardner case. Those are memorandum discussions. I understand, Your Honor. Not binding. They are not binding on this Court. That's correct. But the District Court got it right, and the District Court relied on the reasoning underlying Cottonwood. In the standing discussion of Cottonwood, the Court says these people are injured because the project-specific consultations rely on the links amendments. And so the District Court has applied a framework that if there's a reasonable independent basis, and there is that here, I would point the Court to ER 470. That's the fish and wildlife discussion that terminated informal consultation. There's not a single word about the links amendments in that discussion. And what the alliance would do, this maximalist interpretation of Cottonwood, that would insert an entirely new regulatory process, an entirely new regulatory burden for no conservation benefit. And indeed, what is likely to happen is waiting for the links amendments, then you have an incidental take statement or terms and conditions that allow projects to proceed within certain levels of impact. If you have a project like this one, which is not likely to adversely affect, that's a much lower bar of an effect. The fish and wildlife concurrence says scattered and random effects, insignificant, and, in fact, may benefit snowshoe hare habitat. And this type of analysis is why my clients, who include environmental groups such as the Montana Wilderness Association, bought into this project, and they're here today supporting the project. Now, Section 7D doesn't apply because, as Judge Callahan remarked, the consultation on the project was completed by the NLAA determination. It was also completed at the plan level. And Cottonwood says unit-wide analysis. The only unit in the national forest system has ever had is a national forest. And so the Kootenai Forest Plan, that completed Section 7A2 consultation. If Section D does apply, do you lose? No, we do not. So tell me how you don't lose if Section D does apply. There are two ways. One is there's no irreversible or irretrievable commitment of resources from a project that is not likely to adversely affect. That's reflected in the 7D determination that the Forest Service made. That determination is entitled to deference. I will add also that the plaintiffs haven't put forward any evidence of irreparable harm that is sufficient to clear the bar of Cottonwood, nor is it sufficient to go back and cite the Pacific Rivers or Lane County cases, because those cases cannot any longer be squared with Winter of Monsanto or Cottonwood. Those cases rely on a presumption. Because I think Lane County and Pacific Rivers, doesn't it say that because site-specific consultation on the project is complete, that 7D should not apply or should apply? What does it say exactly? Those cases, Your Honor, and I see my time has expired. But with your indulgence, I will answer Judge Callahan's question. Those cases, particularly in Lane County, there was no opportunity for site-specific consultation. As a matter of law, there was not going to be a site-specific consultation. So there was no possibility that that independent site-specific consultation could address the ESA requirement. And what those cases do, and then it flowed into Washington Toxics, was shifted the burden to the agency under Section 7D. But under Winter of Monsanto and Cottonwood, the burden is always on the plaintiff, the applicant, for injunctive relief. And I thank the Court and request that the judgment below be affirmed. Thank you. Okay, thank you. We'll hear from your battle. First, just to quickly address your question, what happened in Pacific Rivers Council is that the programmatic consultation hadn't started yet. So what this Court said is, right now we're saying you need to reinitiate consultation, and so right now we're enjoining all ongoing actions. However, if once we enjoin and we send it back to the District Court, the agency decides to reinitiate consultation, then that would then trigger ESA Section 7D. And at that point, the District Court on remand would need to address whether it's irreversible or irretrievable commitment of resources. And then this Court said, essentially in dicta, and if the District Court makes that determination, we point them to Lane County Audubon, which said timber sales are per se irretrievable commitments of resources. Additionally, in Lane County, the Court did enjoin a number of timber sales. The ones that consultation had already... Oh, in Pacific Rivers Council, those timber sales did have consultation. Likewise, in Lane County, the timber sales had consultation. This Court remanded to the BLM and said, District Court, decide whether the cases with consultation should be enjoined. The District Court said, well, I already enjoined those in Portland Audubon Society, and the reason that the Court enjoined them in Portland Audubon Society, this is 795 Fed Suppet 1509, quote, this Court cannot evaluate the risks that particular timber sales pose to the survival of the northern spotted owl subspecies when the BLM has no plan that addresses the survival of the northern spotted owl. So that was essentially on remand from Lane County, the companion case that did enjoin the ongoing sales that had consultation. So I would like to address quickly the idea of unit-wide. That's not National Forest Unit. That's Critical Habitat Unit. Lynx Critical Habitat is divided into units, and one of them is the Northern Rockies Critical Habitat Unit. That's what we're talking about when we talk about unit-wide. Addressing the access amendment, absolutely this Court should remand. The interveners and government can't come up with a single place in the project EIS where they assessed the current baseline of the whole tobacco bores and compared it to that 1,124-mile baseline, which was from the original. I took their argument to say that since you didn't really, you know, adequately exhaust on that, that you're sandbagging them right now, that of course it's not in the record because you didn't raise it. Well, Your Honor, that essentially is an argument that the Forest Service will only have to comply with its own forest plans if a member of the public catches them because, of course, this is a forest plan standard, and under the National Forest Management Act 16 U.S.C. 1604, the Forest Service has to demonstrate compliance with forest plan standards in the project EIS. There is only one administrative exhaustion procedure. That's the objection procedure. ISER 132 specifically raised it and said that they're violating the standard or said that they're increasing row density in the bores. There is no other exhaustion procedure other than the objection process, so absolutely remanding to the agency, just like this court did in Haffner v. Tidwell in a very similar case when there was no evidence in the EIS that the project EIS had analyzed this specific forest plan standard. And I see that I am out of time. Thank you. Thank you, counsel. There's a lot there. I appreciate your arguments. Yeah. Thank you.
judges: Fisher, Paez, Callahan